1
2
3
4
5
6
7
8    **UNITED STATES DISTRICT COURT**
9    **CENTRAL DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| | **Case No.: CV 18-08497-CJC(Ex)** |
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **ORDER DENYING PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE, PRELIMINARY INJUNCTION, AND ORDER GRANTING OTHER RELIEF** |
| **v.** | |
| **ERIC J. "EJ" DALIUS, et al.** | |
| **Defendants.** | |

## I.  INTRODUCTION

The SEC brings this enforcement action against Defendants Eric J. "EJ" Dalius, Professional Realty Enterprises, Inc., Saivian LLC, Savings Network App LLC, Saivian International Limited, Saivian INT Limited, and Realty Share Network LLC and Relief Defendants Kimberly A. Dalius, MB Homes LLC, NYC Homes LLC, 1300 Highland

Unit 111 LLC, 1300 Highland Unit 112 LLC, 1300 Highland Unit 211 LLC, and 1300 Highland Unit 212 LLC. (Dkt. 3 [Complaint, hereinafter "Compl."].)

The SEC alleges eight causes of action under the federal securities laws: (1) employing a device, scheme, or artifice to defraud in violation of section 17(a)(1) of the Securities Act, (2) obtaining money or property by means of untrue statements in violation of section 17(a)(2) of the Securities Act, (3) fraud in the offer or sale of securities in violation of section 17(a)(3) of the Securities Act, (4) fraud in connection with the purchase or sale of securities in violation of section 10(b) of the Securities Act and Rule 10b-5(a) and (c), (5) fraud in connection with the purchase or sale of securities in violation of section 10(b) of the Securities Act and Rule 10b-5(b), (6) control person liability under section 20(a) of the Securities Exchange Act, (7) offer and sale of unregistered securities in violation of sections 5(a) and (c) of the Securities Act, and (8) disgorgement. (*See generally* Compl.)

Before the Court is the SEC's *ex parte* application for a temporary restraining order and orders (1) freezing assets, (2) prohibiting the destruction of documents, (3) granting expedited discovery, (4) requiring accountings, and (5) order to show cause regarding a preliminary injunction. (Dkt. 4.) For the following reasons, the SEC's *ex parte* application is **DENIED**.[1]

## II.  BACKGROUND

This case arises out of a cashback benefits and multi-level marketing company called Saivian, founded by Defendant Eric Dalius. (Compl. ¶ 6.) Saivian sold "Cashback Memberships," which offered Cashback Members 20% cashback on their shopping

---

[1] The SEC also filed an *ex parte* motion for leave to file a memorandum of law in excess of the page limit. (Dkt. 9.) The SEC's motion is GRANTED.

purchases if they submitted their point-of-sale receipts to Saivian. (*Id.*) Cashback Memberships cost $125 every 28 calendar days. (*Id.*) Saivian provided shifting explanations for how it funded the promised cashback. (*Id.* ¶ 7.) Initially, Saivian said it sold the point-of-sale data from members' submitted receipts to third parties. (*Id.*) It later told members that the 20% cashback was funded by advertisers on Saivian's website and mobile application. (*Id.*) Both of these explanations were allegedly false. (*Id.* ¶ 8.)

The SEC alleges that Saivian operated as an illegal Ponzi and pyramid scheme. Like a classic Ponzi scheme, Saivian satisfied promised returns to some investors through the investments of other investors, as Saivian's revenue was generated almost exclusively by membership sales to Cashback Members themselves. (*Id.* ¶ 9.) Like a pyramid scheme, Saivian required a constant influx of new investors to remain solvent. (*Id.* ¶ 10.) Cashback Members were urged to become "Affiliates" and sell Cashback Memberships to others. (*Id.*) Between October 26, 2015 and September 1, 2017, Defendants raised millions of dollars from Cashback Members in the United States and abroad. (*Id.*) Saivian officially ended its global operations in September 2017, after halting its United States business at the end of July 2017. (Dkt. 10 Exs. 11, 36.)

The voluminous exhibits in the record suggest the SEC has been investigating Saivian for a significant period of time. The SEC first deposed former Saivian employees in December 2016 and January 2017. (Dkt. 10 Exs. 101–03, 106.) The most recent deposition occurred in October 2017, when the SEC interviewed Dalius himself. (Dkt. 10 Ex. 104.) The SEC subpoenaed most of the submitted records one or two years ago.[2]

---

[2] *See* Dkt. 10 Ex. 2 [certification of business records executed on April 11, 2017]; *id.* Ex. 16 [subpoena received on December 28, 2016]; *id.* Ex. 17 [certification of business records executed on September 18, 2017]; *id.* Ex. 21 [executed on June 16, 2016]; *id.* Ex. 24 [executed on April 27, 2016]; *id.* Ex. 26 [executed on October 31, 2016]; *id.* Ex. 47 [executed on November 28, 2017]; *id.* Ex. 68 [executed on May 12, 2016]; *id.* Ex. 70 [executed on May 15, 2017]; *id.* Ex. 72 [executed on September 8, 2017].

Despite the shuttering of Saivian and a long-running investigation, the SEC now seeks emergency relief, without any notice to Defendants.  The SEC requests a temporary restraining order and an order broadly freezing Defendants' assets, permitting expedited discovery, and compelling Defendants to prepare an accounting, among other forms of relief.  (Dkt. 4.)  The SEC argues that Dalius' past fraud conviction and use of cyber currencies and Saivian funds to purchase real estate makes it more likely that he will take steps to divert funds if he receives notice before an order issues.  (Dkt. 8 [Declaration of Kenneth Guido in Support of Plaintiff's *Ex Parte* Application for Waiver of Notice, hereinafter "Guido Decl."] ¶¶ 6–12.)

## III.  *EX PARTE* ISSUANCE OF A TEMPORARY RESTRAINING ORDER

### A.    Legal Standard

The Fifth Amendment enshrines a bedrock principle of our democracy: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The protection of the Due Process Clause extends to all, whether that person is a criminal defendant, *Cole v. Arkansas*, 333 U.S. 196, 201 (1948), a non-citizen, *Mathews v. Diaz*, 426 U.S. 67, 77 (1976), or even, as here, a purported fraudster who made millions off his victims.  At its core, due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted).  The constitutional right to be heard serves "to minimize the substantively unfair or mistaken deprivations of property," as "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights."  *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).  "[T]he prohibition against the deprivation of property without due process of law reflects the high value, embedded in

The exceptions are Exhibit 3 (dated March 5, 2018), Exhibit 19 (dated March 1, 2018), and Exhibit 35 (dated January 2, 2018).

our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference." *Id.* at 81.

Pursuant to this tradition, an *ex parte* temporary restraining order is an extraordinary and drastic remedy that may only be awarded upon a clear showing that the moving party is entitled to relief. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 438–39 (1974). A plaintiff seeking a temporary restraining order "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standard for issuing a temporary restraining order "substantially identical" to that for issuing a preliminary injunction). The Ninth Circuit balances these "*Winter* factors" using a "sliding scale" approach, where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). However, *Winter* "requires the plaintiff to make a showing on *all* four prongs." *Id.* at 1135 (emphasis added).

According to the SEC, it appears before this Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). Given this posture, the SEC asserts the government must make only a two-pronged showing in SEC emergency actions: (1) a *prima facie* case that the defendants have violated the federal securities laws and (2) a reasonable likelihood that the defendants will repeat their violations. *See, e.g., SEC v. Muehler*, 2018 WL 1665637, at *4–5 (C.D. Cal. Apr. 4,

2018); *SEC v. Capital Cove Bancorp, LLC*, 2015 WL 9704076, at *5–6 (C.D. Cal. Sept. 1, 2015).

The Ninth Circuit, however, has not expressly adopted this standard.  *See Muehler*, 2018 WL 1665637, at *4; *cf. Mgmt. Dynamics*, 515 F.2d at 808 (adopting this standard in the Second Circuit).  The Ninth Circuit has recognized a distinction between a preliminary injunction involving the claims of two private litigants and a preliminary injunction authorized by a federal statute to enforce a Congressional policy.  *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174–75 (9th Cir. 1987).  In statutory enforcement cases, if the government has met the "probability of success" prong of the preliminary injunction test, courts assume that the government has also met the "possibility of irreparable injury" prong, because "the passage of the statute is itself an implied finding by Congress that violations will harm the public."[3]  *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992).  But where the government makes only a "colorable evidentiary showing" of a violation, the court must consider the possibility of irreparable injury.  *Id.*  In either case, the SEC must still show the defendant is reasonably likely to commit future violations of the federal securities laws.  *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996).

Here, the SEC seeks an *ex parte* temporary restraining order, without notice to the Defendants.  Federal Rule of Civil Procedure 65(b) provides extra safeguards in such situations:

> **(1) *Issuing Without Notice.***  The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

---

[3] It is unsettled whether such a categorical approach to irreparable injury is proper.  *See Meyer v. Portfolio Assocs., LLC*, 707 F.3d 1036, 1044 (9th Cir. 2012) (questioning whether a court may approve an injunction without a showing of irreparable harm when the injunction is sought to prevent violations of federal statutes that specifically provide for injunctive relief).

**(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

**(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b).  In other words, "while a standard-issue preliminary injunction must find a *likelihood* of irreparable harm, a secret-issue TRO must find a certainty of it." *SEC v. Schooler*, 2012 WL 4049956, at *2 (S.D. Cal. Sept. 13, 2012).  Rule 65(b)'s "stringent restrictions . . . reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose*, 415 U.S. at 438–39.

Consistent with these concerns, there are "very few circumstances" that justify the issuance of an *ex parte* temporary restraining order.  *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).  "In cases where notice could have been given to an adverse party, courts have recognized 'a very narrow band of cases in which ex parte orders are proper because notice to the defendant would render fruitless the further prosecution of the action.'"  *Id.* (quoting *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984)).  To justify a temporary restraining order in such situations, "the applicant must do more than assert that the adverse party would dispose of evidence if given notice."  *Reno Air*, 452 F.3d at 1131 (quoting *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993)).

Where, as here, the government seeks an *ex parte* temporary restraining order without notice to the defendants, Federal Rule of Civil Procedure 65(b) requires the government to prove that there will be "*immediate and irreparable* injury, loss, or damage" before the court can issue an order.  Fed. R. Civ. P. 65(b)(1)(A) (emphasis added).  The cases cited by the SEC to support its two-prong standard do not indicate

otherwise.  The Second Circuit originally articulated the two-prong standard in the context of a preliminary injunction, not an *ex parte* temporary restraining order.  *See Mgmt. Dynamics*, 515 F.2d at 808.  Similarly, the other cases cited by the SEC do not involve *ex parte* temporary restraining orders that implicate Rule 65(b).  *See Muehler*, 2018 WL 1665637, at *1 (preliminary injunction); *Capital Cove*, 2015 WL 9704076, at *1 (preliminary injunction); *SEC v. Schooler*, 902 F. Supp. 2d 1341, 1344–45 (S.D. Cal. 2012) (preliminary injunction); *SEC v. Homestead Props. L.P.*, 2009 WL 5173685, at *1–2 (C.D. Cal. 2009) (preliminary injunction).

**B.    Analysis**

The SEC has failed to demonstrate that there will be "immediate and irreparable injury, loss, or damage" before Defendants can be heard in opposition.  *Cf.* Fed. R. Civ. P. 65(b)(1)(A).  As a preliminary matter, there appears to be no ongoing fraud.  Saivian's operations halted in September 2017—over a year ago.  There are no allegations that any Defendants continue to engage in fraud, as the Complaint concerns activity from October 2015 to September 2017.  The SEC focuses on the fact that Dalius was previously criminally convicted for fraud in 2000 and refused to confirm whether he was retired when asked by the SEC.  (*See* Dkt. 7 [Memorandum of Law, hereinafter "App."] at 31.) But there is no indication that Dalius or any Defendants continue to engage in fraudulent activity.

The SEC has further failed to prove that there is any immediate risk that Defendants will attempt to obfuscate or divert funds.  The SEC claims Dalius is likely to "take additional steps to transfer or hide funds funds [sic] and assets before a temporary restraining order can issue or destroys [sic] evidence."  (Guido Decl. ¶ 13.)  Dalius has apparently used funds from the scheme to purchase real estate in New York and Florida in October and November 2017 and has transferred funds to cyber currencies like

Bitcoin.  (*Id.* ¶¶ 7–10.)  However, the SEC interviewed Dalius back in October 2017, so he has long had notice about the possibility of SEC enforcement action.  (*See* Dkt. 10 Ex. 104 [E. Dalius Transcript].)  The real estate transactions happened last year.  The SEC has not proved there is likely to be *immediate* harm in the time that it would take to hear from Defendants in opposition.

There is also no evidence that Dalius has transferred assets in a way that would thwart the SEC's or this Court's ability to recover funds.  The SEC points to transactions which involved the purchase of non-liquid assets: (1) the purchase of a home in New York City for $10.6 million, (2) the purchase of a home in Miami Beach for $16.5 million, and (3) the transfer of $5 million worth of Bitcoin to fund the construction and purchase of real estate in southern California.  (*See* Guido Decl. ¶¶ 8–10.)  Since real estate is non-liquid, Dalius is unlikely to sell off or transfer these assets within the several days it takes to provide notice to a defendant regarding a temporary restraining order or the several weeks it takes to schedule a motion on a preliminary injunction.  The SEC concedes there is no evidence in the record that Dalius is moving funds offshore. Although Dalius conducted much of Saivian's business through Bitcoin, the SEC's own records indicate that significant funds have already been converted from Bitcoin to non-liquid assets like real estate or cars or to United States bank accounts and used for travel, law firm expenses, and tax payments.  (Dkt. 10 Ex. 101 [Declaration of Margaret Mary Vizzi, hereinafter "Vizzi Decl."] ¶¶ 11–12, 17–23.)

The SEC's delay in bringing this action also weighs against finding there would be immediate and irreparable harm.  *See Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1097 (N.D. Cal. 2012) ("Parties spurred on by the threat of or actual immediate irreparable harm file for TROs as quickly as possible to head or stave it off."). Saivian closed down in September 2017.  The SEC appears to have possessed information about the alleged fraud for over year, as the SEC interviewed former Saivian

employees months and even years ago.[4]  Although this delay may have enabled the SEC to build a stronger case against Defendants, it undermines the SEC's position that emergency relief through an *ex parte* temporary restraining order is necessary to prevent immediate and irreparable harm.

Lastly, to justify the need for a temporary restraining order and other ancillary relief, the SEC focuses on the possibility that Dalius might divert funds through his complicated web of bank accounts, concierge services, and Bitcoin assets.  But this concerns the availability of *relief*.  Since Saivian is no longer in business, the alleged fraud is not continuing to inflict injury, damage, or loss.  *Cf.* Fed. R. Civ. P. 65(b). Evidence that Dalius controls and transfers his assets in a complicated manner does not "clearly show" that harm will result in the absence of emergency relief.  *See id.*

## IV.  ISSUES WITH THE SEC'S REQUESTED RELIEF

The lack of immediate and irreparable injury poses problems for the rest of the SEC's requested relief.  Without a clear showing of immediate and irreparable injury, damage, or loss, this Court cannot grant the other forms of requested relief without notice to Defendants.  *See id.*

### 1.   Asset Freeze

The SEC asks this Court for an order freezing Defendants' assets.  "A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted."  *Johnson v.*

---

[4] *See* Dkt. 10 Ex. 101 [Excerpts of Gewecke Transcript] [recorded on December 1, 2016]; *id.* Ex. 102 [Excerpts of Marino Transcript] [recorded on December 19, 2016]; *id.* Ex. 103 [Excerpts of Sheehan Transcript] [recorded on January 13, 2017]; *id.* Ex. 105 [Excerpts of Evans Transcript] [recorded on September 26, 2017]; *id.* Ex. 106 [Excerpts of Kim Transcript] [recorded on December 14, 2017].

*Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). The dissipation of assets must not just be possible, but likely.[5] *See id.* at 1085 n.11 (overruling the lower "possibility" standard from *FSLIC v. Sahni*, 868 F.2d 1096 (9th Cir. 1989), in the wake of *Winter*); *accord Schooler*, 902 F. Supp. 2d at 1359–60. Courts deny requests for asset freezes where there is no evidence that the defendants are sheltering or hiding money. *See Schooler*, 902 F. Supp. 2d at 1360 (questioning asset freeze where there was no evidence that defendants had nefariously shuffled around money, despite the fact that the SEC had been openly monitoring them for over a year); *FTC v. John Beck Amazing Profits, LLC*, 2009 WL 7844076 at *15 (C.D. Cal. Nov. 17, 2009) (denying asset freeze for lack of evidence that defendants "have ever previously attempted to intentionally dissipate, hide or otherwise shelter corporate or personal assets from an effort to collect a debt or judgment").

        As noted above, the SEC has failed to show that Dalius or any of the Defendants are likely to transfer or hide funds in a way that would limit the SEC's ability to recover assets. Since the SEC contacted Dalius as part of its investigation, Dalius has made several real estate acquisitions, partly through transfers of cyber currencies. But the purchase of real estate—a highly non-liquid asset—does not suggest a tendency to hide funds. These transfers occurred over a year ago, which again undermines the SEC's assertion that it needs emergency relief *now*, particularly when the SEC has spent some time monitoring Defendants. (*See* Guido Decl. ¶ 8–9 [New York and Florida real estate transactions occurred in October and November 2017]; *see also* Vizzi Decl. ¶ 20 [transfers related to southern California real estate development occurred in February and

---

[5] The SEC argues that, unlike private plaintiffs, it only needs to prove a possibility—rather than a likelihood—of the dissipation of assets when it brings a statutory enforcement action. (*See* App. at 32 n.21.) *Johnson v. Couturier* held otherwise. 572 F.3d 1067 (9th Cir. 2009). In *Johnson*, the Ninth Circuit explicitly overruled a case in which the lower standard was applied to an asset freeze sought by the Federal Savings and Loan Insurance Corporation. *See id.* at 1085 n.11. The Federal Savings and Loan Insurance Corporation was a federal entity tasked to act in the public interest, similar to the SEC here. *See FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989), *overruled by Johnson*, 572 F.3d at 1085 n.11.

March 2017].)  There is no showing that Defendants have actively moved assets overseas.  The SEC has submitted an affidavit by an accountant outlining the various transfers made to and from Defendants' accounts, but these transfers do not suggest an intent to dissipate or hide funds.  In contrast, many of the transfers involve mundane expenses like college tuition, taxes, and legal services.  (*See generally* Vizzi Decl.)

Moreover, the asset freeze is overly broad.  The SEC employs broad and sweeping language in its proposed asset freeze:

> Defendants and their officers, agents, servants, employees, family members, attorneys, and those persons in active concert or participation with them . . . shall hold and retain within their control . . . any direct or indirect withdrawal . . . of any funds, assets, or securities, or other real or personal property . . . of Defendants, and their subsidiaries and affiliates.

(Dkt. 4-1 [Proposed Order] at 6.)  The SEC does not seek to freeze a narrow, defined list of bank accounts, but broadly requests to freeze all of Defendants' property, in whatever form, and from whatever source.  The proposed asset freeze would conceivably extend to Dalius's normal living expenses and legal fees.  *Cf. Johnson*, 572 F.3d at 1085–86 (granting limited asset freeze that permitted defendant to cover normal living expenses and legal expenses).  The proposed relief does not match the purported harm.

The SEC's proposed asset freeze also fails to meet Federal Rule of Civil Procedure 65(d)'s specificity requirements.  Rule 65(d) requires that any injunction or restraining order "state its terms specifically" and "describe in reasonable detail—and not by reference to the complaint or other document—the acts or acts restrained or required."  Fed. R. Civ. P. 65(d).  This specificity requirement "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974); *see also Reno Air*, 452 F.3d at 1132.

The proposed asset freeze fails to specify in reasonable detail what acts are restrained.  The proposed order does not identify the names of the Defendants that are implicated under the asset freeze.  It directs financial and brokerage institutions to prevent withdrawals and transfers of assets, (*id.* at 7), but it does not identify specific accounts owned by Defendants.  The SEC appears to know specific accounts that belong to Defendants, (*see generally* Vizzi Decl.), but the SEC has not provided a list that clearly identifies the accounts affected by an asset freeze.  The proposed order also does not define what kinds of property would fall under the asset freeze.  A broad and indefinite asset freeze, as proposed by the SEC, would likely create "uncertainty and confusion" for those seeking to comply.  *See Schmidt*, 414 U.S. at 476.

## 2.    Expedited Discovery

The SEC also seeks an order granting expedited discovery.  A court may order expedited discovery for good cause.  See Fed. R. Civ. P. 26(d)(1); *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009) (citing cases).  The "good cause" standard may be satisfied where a party seeks a preliminary injunction, but a preliminary injunction application does not automatically entitle a party to expedited discovery.  *Am. LegalNet*, 673 F. Supp. 2d at 1066.  In determining whether a plaintiff's request for expedited discovery is reasonable, courts consider the following factors: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made."  *Id.* at 1067 (quoting *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Authority*, 234 F.R.D. 4, 6 (D.D.C. 2006) (internal quotations omitted)); *see also Franco-Gonzalez v. Napolitano*, 2010 WL 11479349, at*3 (C.D. Cal. Nov. 24, 2010).

The SEC has failed to establish the requisite "good cause" for expedited discovery. The SEC asks to dispose of notice requirements, increase the number and length of depositions the SEC may take, and shorten deadlines. (Proposed Order at 9–10.) The SEC does not specify any limit on the breadth of expedited discovery. *Cf. Am. LegalNet*, 673 F. Supp. 2d at 1068–69 (denying request for expedited discovery where there was no effort to limit the topics on which the party sought to depose and the request was not "narrowly limited to obtain information relevant to a preliminary injunction determination"). The SEC further fails to establish a need for expedited discovery. The record indicates that the SEC has engaged in extensive fact-finding before it filed this lawsuit. The SEC has conducted at least six depositions and collected over 1,100 pages of documents related to its investigation of Saivian. (*See* Dkt. 10.) The SEC does not identify what specific documents or testimony that it would seek in the fourteen days before a hearing on a preliminary injunction.

The procedure and process proposed by the SEC also raise serious constitutional concerns. The SEC's only argument on the need for expedited discovery is Dalius's refusal "(1) to comply with the SEC's discovery requests, (2) to produce financial documents needed to determine the scope of the Saivian fraud, and (3) answer any substantive questions during testimony." (App. at 34.) Dalius repeatedly refused to answer questions during his deposition based on his Fifth Amendment right against self-incrimination. (*See generally* Dkt. 10 Ex. 104 [E. Dalius Transcript].) Expedited discovery may interfere with Dalius's ability to continue to assert his Fifth Amendment rights and to be adequately represented by counsel. This is a particular concern when an SEC investigation, like the one here, has criminal overtones. *See, e.g.*, *United States v. Stringer*, 535 F.3d 929, 942 (9th Cir. 2008) (permitting information gained through an SEC civil investigation to be used in a criminal proceeding).

//

### 3.      Accountings

The SEC seeks an order requiring accountings "of all funds, assets and liabilities" exceeding $5,000 in value held by each Defendant.  (Proposed Order at 11.)  The SEC also seeks "full access to and permit copying of all documents" under the control of Defendants.  (*Id.*)  The Court is concerned with how it would administer such an order.  The proposed timeline would likely require almost superhuman abilities: under the SEC's proposed order, Defendants must provide verified, written accountings *within three calendar days*.  (Proposed Order at 11.)  A defendant can easily comply with an order that clearly restricts certain activities, but an order that requires the defendant to act affirmatively is another matter.  *See Reno Air*, 452 F.3d at 1132–34 (describing judicial contempt as "a potent weapon" and requiring temporary restraining orders to be "specific in terms" so that a recipient is "not left guessing").  Requiring Defendants to provide the SEC with "full access to" all documents raises additional constitutional concerns under the Fourth and Fifth Amendments.  Dalius is entitled to his right against self-incrimination.  *See United States v. Balsys*, 524 U.S. 666, 672 (1998) (noting that the Fifth Amendment privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, . . . in which the witness reasonably believes that the information sought, or discoverable as a result of his testimony, could be used in a subsequent state or federal criminal proceeding" (internal quotation marks omitted)).  The possibility of a parallel criminal proceeding may implicate the Fourth Amendment's prohibition against unreasonable search and seizures, particularly where Defendants are required to provide the government with full access.  *See Stringer*, 535 F.3d at 940 (recognizing that "Fourth Amendment and possible due process limitations may be implicated in a dual investigation").

//

//

**V.  CONCLUSION**

"[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Fuentes*, 407 U.S. at 81.  To justify action in such situations, the SEC must show there would be immediate and irreparable harm in the absence of a secret-issue order.  The SEC fails to do so here.  For the foregoing reasons, the SEC's *ex parte* application for a temporary restraining order is **DENIED**.

DATED:     October 11, 2018

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE