KENNETH W. DONNELLY
donnellyk@sec.gov
DEREK S. BENTSEN (Cal. Bar No. 232550)
bentsend@sec.gov
GEOFFREY GETTINGER
gettingerg@sec.gov
MICHAEL FLANAGAN
flanaganm@sec.gov
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-4946 (Donnelly)
Facsimile: (202) 772-9282 (Donnelly)

LOCAL COUNSEL
LYNN M. DEAN (Cal. Bar No. 302928)
Email: deanl@sec.gov
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3245
Facsimile: (213) 443-1904

Attorneys for the Plaintiff
Securities and Exchange Commission

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | Case No. 2:18-cv-08497-CJC-E |
| **PLAINTIFF,** | |
| v. | **AMENDED COMPLAINT** |
| **ERIC J. "EJ" DALIUS**, an individual, | **JURY TRIAL REQUESTED** |
| **RYAN MORGAN EVANS**, an individual, | |
| **PROFESSIONAL REALTY ENTERPRISES, INC.**, a Corporation, | |
| **SAIVIAN LLC**, a Limited Liability Company, | |

1   **SAVINGS NETWORK APP LLC,** a
2   Limited Liability Company,

3   **SAVING NETWORK APP LIMITED,** a
4   Limited Company,

5   **SAIVIAN INTERNATIONAL
    LIMITED,** a Limited Company,
6

7   **SAIVIAN INT LIMITED,** a Private
    Company, and
8

9   **REALTY SHARE NETWORK LLC,** a
    Limited Liability Company.
10

11          **DEFENDANTS.**

12

13  **MB HOMES LLC,** a Limited Liability
    Company,
14

15  **NYC HOMES LLC,** a Limited Liability
    Company,
16

17  **1300 HIGHLAND UNIT 111 LLC,** a
    Limited Liability Company,
18

19  **1300 HIGHLAND UNIT 112 LLC,** a
    Limited Liability Company,
20

21  **1300 HIGHLAND UNIT 211 LLC,** a
    Limited Liability Company, and
22

23  **1300 HIGHLAND UNIT 212 LLC,** a
    Limited Liability Company.
24

25          **RELIEF DEFENDANTS.**

26

27

28

## **COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges:

## **JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction by authority of Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and Section 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa] because Defendants, directly and indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the offer and sale of securities and the acts and courses of business alleged herein.

2.      Venue for this action is proper in the Central District of California under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices and courses of business alleged in this Complaint, including, but not limited to, the offers and sales of securities, took place in this district.

## **INTRODUCTION**

3.      The case seeks injunctive and other relief to enjoin a multi-million dollar Ponzi and pyramid scheme and offering fraud operated by Defendants under the general offering name "Saivian" that targeted investors in the United States and around the world.

4.      The Corporate Defendants, Professional Realty Enterprises, Inc., Saivian LLC, Savings Network App LLC, Saving Network App Limited, Saivian International Limited, Saivian INT Limited, and Realty Share Network LLC, are seven connected entities based in the United States, Hong Kong and the United Kingdom that collectively operated under the business name "Saivian." An individual defendant, Eric J. "EJ" Dalius, controlled Saivian and each of its entities and personally reaped substantial sums from Saivian investors. Additional

individual defendant, Ryan Morgan Evans, took actions which furthered the Saivian scheme, from which he too substantially profited.

5.     Billed as a successful company harvesting big data from point-of-sale ("POS") receipts that provided cashback benefits and multi-level marketing income to its members, Saivian, in reality, was a Ponzi and pyramid scheme.  Beginning on October 26, 2015 and continuing through at least September 2017, Defendant Dalius solicited persons in the United States and around the world to purchase "Cashback Memberships" with Saivian.  Beginning about January 2016 and through about September 2017, Defendant Evans also solicited investors to purchase Cashback Memberships.  The Memberships, which cost $125 every 28 calendar days, offered 20% cashback on Cashback Members' shopping purchases in exchange for submission of their POS receipts for those purchases to Saivian.

6.     Defendants employed shifting explanations for how Saivian funded the promised cashback.  Initially, Defendants explained that the revenue to satisfy its cashback obligation was generated from the sale of Cashback Members' POS receipts to third parties who purchased either the receipts themselves or the data embedded in the receipts ("marketing partners" or "advertising partners").  Later, Defendants explained that the funds to pay the 20% cashback also was provided by merchants who purchased a different Saivian membership that enabled them to advertise on Saivian's website and/or mobile application (the "MAP Program").

7.     Both of these explanations were false.  Contrary to their claims, Saivian did not generate any revenue from the sale of POS receipts.  In fact, Saivian never had any marketing partners (or advertising partners) and never made any serious efforts to sell or otherwise monetize the data in its Cashback Members' POS receipts.  Moreover, while membership payments from the MAP Program contributed some revenue to the enterprise— less than a hundred thousand

dollars— it was nowhere near sufficient to fund the cashback payments that Saivian promised or made to its Cashback Members.

8. Instead, Saivian's revenue was generated almost exclusively from membership sales to Cashback Members themselves. Like a classic Ponzi scheme, Saivian satisfied promised returns to some investors—in the form of 20% cashback on shopping purchases—through the investments of other investors rather than any underlying, legitimate, commercial activity.

9. Saivian was also a pyramid scheme that required the constant influx of new investors to remain solvent. In order to keep the scheme afloat, Defendants urged Cashback Members to become "Affiliates" and sell Saivian Cashback Memberships to others, which Defendants claimed would provide the Affiliates with substantial financial benefits. Between October 26, 2015 and September 1, 2017, Corporate Defendants and Dalius raised millions of dollars from Cashback Members in the United States and abroad. Most of this was misappropriated by Dalius to support his and his family's lavish lifestyle.

10. As a result of their conduct, Defendants violated Sections 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder, and the registration provisions of Sections 5(a) and 5(c) of the Securities Act. Defendant Dalius is liable for these violations directly and as a control person under Section 20(a) of the Exchange Act.

11. In order to prevent additional fraudulent activity, to prevent further dissipation of investors' funds, and to recover fraudulently obtain funds, the Commission seeks a civil injunctive order against Defendants against further violations of the federal securities laws, as well as disgorgement, prejudgment interest and civil penalties from Defendants.

**DEFENDANTS**

12.     **Eric J. "EJ" Dalius** ("Dalius"), age 48, is a United States citizen who owns residences in New York, California, Florida and Pennsylvania.  Dalius is the founder, sole shareholder and sole director of Defendants Professional Realty Enterprises, Saving Network App Limited, Saivian International Limited, and Saivian INT Limited.  Dalius was indicted in the Eastern District of Pennsylvania in January 2000 on mail fraud, wire fraud, and conspiracy charges in connection with a long distance phone card scam.  *United States v. Dalius*, 2:00-cr-00026-FVA-I (E.D. Pa).  He pleaded guilty to a conspiracy charge and was sentenced to 12 months and 2 days imprisonment, 3 years of supervised release, and restitution.

13.     **Ryan Morgan Evans** ("Evans"), age 35, is a United States citizen who lives in San Jose, California.  Between approximately January 2016 and October 2016, Evans was a Saivian Cashback Member and Affiliate.  From or around October 21, 2016, Evans held himself out as the Operations Director of Saivian International Limited.  From or around June 8, 2017, through on or around September 1, 2017, Evans held himself out as Vice President of Marketing for Saivian International Limited.  Pursuant to an understanding between Evans and Dalius, Evans was compensated as Operations Director at a rate of $.50 for every new Cashback Membership sale paid directly to Saivian.  As Vice President of Marketing, Evans was compensated by Dalius at a rate of $20,000 per month.

14.     **Professional Reality Enterprises** ("PRE") is a Pennsylvania corporation that was registered to do business on January 2, 2003.  PRE's registered office address is 51 Bushkill Court, Reading Pennsylvania 19606.  PRE registered a website located at www.saivian.net that promoted the scheme and served as the gateway for Saivian Cashback Members and Affiliates to manage their accounts.  PRE maintained bank accounts in the United States that were used to receive and transfer funds from Saivian investors located in the United States and around the

world.  Dalius was the authorized signatory for these accounts.  PRE is not registered with the SEC, and has not registered any offering or class of its securities with the SEC.

15.   **Saivian LLC** is a Delaware limited liability company that was registered to do business on November 2, 2015 by Dalius through Worldwide Incorporators Ltd.  Saivian LLC is wholly owned by PRE.  Saivian LLC's registered office address is 58 Linree Avenue, Reading, Pennsylvania, 19606. Saivian LLC maintained bank accounts in the United States that were used to receive and transfer funds from Saivian investors located in the United States and around the world.  Dalius was the authorized signatory for these accounts.  Saivian LLC is not registered with the SEC, and has not registered any offering or class of its securities with the SEC.

16.   **Savings Network App LLC** ("Savings Network App") is a Delaware limited liability company that was registered to do business on April 20, 2016 by Dalius.  Savings Network App is wholly owned by PRE.  Savings Network App's registered office address is c/o Worldwide Incorporators LTD, as Statutory Agent, Rodney Building, 3411 Silverside Rd., Ste 104, Wilmington, DE 19810.  Savings Network App maintained bank accounts in the United States that were used to receive and transfer funds from Saivian investors located in the United States and around the world.  Dalius was the authorized signatory for these accounts.  Savings Network App LLC is not registered with the SEC, and has not registered any offering or class of its securities with the SEC.

17.   **Saving Network App Limited** is a limited company that was registered to do business in Hong Kong on May 12, 2016.  Saving Network App Limited is wholly owned by Dalius.  Savings Network App Limited's registered office address is Room 1217, 12/F, International Commerce Center, 1 Austin Road West, Kowloon, Hong Kong.  Dalius, on behalf of Saving Network App Limited,

1    entered into a contract in California related to the design and production of the

2    Saivian mobile application.  Saving Network App Limited is not registered with the

3    SEC, and has not registered any offering or class of its securities with the SEC.

4         18.    **Saivian International Limited ("Saivian International")** is a limited

5    company that was registered to do business in Hong Kong on October 4, 2016.

6    Saivian International is owned entirely by Dalius.  Saivian International's registered

7    office address is Room 1505, 15/F., Yu Sung Boon Building, 107-111 Des Voeux

8    Road Central, Hong Kong.  Dalius, on behalf of Saivian International, entered into

9    a contract in California with a software and website developer related to the

10   maintenance of the database containing all of Saivian's Membership and Affiliate

11   records.  Saivian International Limited is not registered with the SEC, and has not

12   registered any offering or class of its securities with the SEC.

13        19.    **Saivian INT Limited ("Saivian INT")** is a private United Kingdom

14   company established on June 1, 2017.  Saivian INT is owned entirely by Dalius.

15   Saivian INT is not registered with the SEC, and has not registered any offering or

16   class of its securities with the SEC.

17        20.    **Realty Share Network LLC ("Realty Share")** is a Delaware limited

18   liability company that was registered to do business on October 2, 2015.  Realty

19   Share is wholly owned by PRE.  Realty Share's registered office address is c/o

20   Worldwide Incorporators LTD., as Statutory Agent, Rodney Building, 3411

21   Silverside Rd., Ste 104, Wilmington, DE 19810.  Realty Share maintained a bank

22   account in the United States that was used to receive and transfer funds from

23   Saivian investors located in the United States.  Dalius was the authorized signatory

24   for this account.

25                            **RELIEF DEFENDANTS**

26        21.    **MB Homes LLC** is a Nevada limited liability company established on

27   January 9, 2017.  Its registered office address is c/o Burnett & Associates, Inc.,

28

9441 Double Diamond Pkwy, STE 11, Reno, NV 89521.  The company is owned and/or controlled by Defendant Eric Dalius.  MB Homes LLC is the owner of certain real property in California that was purchased with proceeds from the Saivian scheme.  It did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

22.  **NYC Homes LLC** is a Delaware limited liability company established on September 26, 2017. Its registered office address is c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.  The company is owned and/or controlled by Eric Dalius and Kimberly A. Dalius (the wife of Defendant Dalius) and is the owner of certain real property in New York that was purchased with proceeds from the Saivian scheme.  It did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

23.  **1300 Highland Unit 111 LLC** is a Nevada limited liability company established on July 25, 2017.  Its registered office address is Burnett & Associates, Inc., 9441 Double Diamond Pkwy, STE 11, Reno, NV 89521.  The company is owned and/or controlled by Eric Dalius.  1300 Highland Unit 111 LLC is the owner of certain real property in California that was purchased with proceeds from the Saivian scheme.  It did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

24.  **1300 Highland Unit 112 LLC** is a Nevada limited liability company established on July 25, 2017.  The company is owned and/or controlled by Eric Dalius.  Its registered office address is Burnett & Associates, Inc., 9441 Double Diamond Pkwy, STE 11, Reno, NV 89521.  1300 Highland Unit 112 LLC is the owner of certain real property in California that was purchased with proceeds from the Saivian scheme.  It did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

25.  **1300 Highland Unit 211 LLC** is a Nevada limited liability company established on July 25, 2017.  Its registered office address is Burnett & Associates, Inc., 9441 Double Diamond Pkwy, STE 11, Reno, NV 89521.  The company is owned and/or controlled by Eric Dalius.  1300 Highland Unit 211 LLC is the owner of certain real property in California that was purchased with proceeds from the Saivian scheme.  It did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

26.  **1300 Highland Unit 212 LLC** is a Nevada limited liability company established on July 25, 2017.  Its registered office address is Burnett & Associates, Inc., 9441 Double Diamond Pkwy, STE 11, Reno, NV 89521.  The company is owned and/or controlled by Eric Dalius.  1300 Highland Unit 212 LLC is the owner of certain real property in California that was purchased with proceeds from the Saivian scheme.  It did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

## FACTS

### I.  The Illegal Saivian Scheme

27.  Between October 2015 and September 2017, Eric J. "EJ" Dalius ("Dalius"), individually and through the entity Defendants (the "Corporate Defendants"), operated a Ponzi and pyramid scheme in the form of the Saivian offering.  In particular, Saivian's Cashback Membership program operated as a Ponzi scheme because the returns it paid to investors were derived almost exclusively from other investors' funds in the form of Cashback Membership payments rather than any legitimate commercial activity.  Saivian's Affiliate program operated as a pyramid scheme because its Affiliates profited almost exclusively by recruiting new Affiliates to join the program.

28.  Dalius conceived of and orchestrated the illegal Saivian scheme.  He exercised sole control over all Corporate Defendants from offices located first in Pennsylvania and then in the Central District of California.  He incorporated all

Corporate Defendants which were the entities through which the scheme was executed.

29.     He was the sole signatory of all agreements with third parties on behalf of Saivian and the Corporate Defendants.  He established and was sole signatory on all Saivian related Corporate Defendant bank accounts.  He established and controlled digital asset (including Bitcoin) accounts through which Saivian-related transactions occurred.  He registered the Saivian-related website domains and controlled all content that appeared on the sites.  He personally made misstatements to investors concerning the Saivian scheme.  He wrote and approved scripts for others to use in soliciting potential investors, including statements made at teleconferences, webinars, live events and recorded on video and posted to Saivian's website, YouTube and other publicly-available sites on the internet.

A.     __Saivian's Cashback Membership Program was a Ponzi Scheme__

30.     Saivian promised its investors that Cashback Members were entitled to obtain 20% cashback on their retail purchases (subject to a host of rules and restrictions).  The Membership cost $125 every 28 calendar days.  In order to obtain the 20% cashback, Cashback Members were required to maintain an active Membership and submit their POS receipts to Saivian.  The cashback payments to Cashback Members were on a sixty day delay from when POS receipts were submitted.  Cashback Members had to continue their Memberships during this entire period in order to remain eligible to receive payments.  Cashback Members' investments were pooled together and their expectation of profit was dependent on Saivian.  As a result, a Saivian Membership was an "investment contract" within the meaning of the federal securities laws.

31.     Dalius and Saivian promoted the Cashback Membership program through publicly available websites, recorded videos available on YouTube and other publically available internet sites, webinars, conference calls, social media

1    posts, and live events.  Evans promoted the Cashback Membership program in

2    similar fashion, and at least through webinars, conference calls, social media posts

3    and live events.

4         32.    Dalius and Saivian concocted vague, inconsistent, and ultimately false

5    explanations for how it derived the funds necessary to pay the cashback that it

6    promised.  In addition to Dalius and Saivian, Evans also made these misleading and

7    false explanations to investors.  The revenue that Saivian used to fund the cashback

8    payments to its Cashback Members were purportedly derived from two sources.

9    Initially, Dalius, Evans, and Saivian claimed that it worked with third parties to

10   whom it sold either the POS receipts that Cashback Members submitted or the data

11   embedded in the receipts.  These third parties were called "marketing partners" or

12   "advertising partners" and were purposely never identified to investors.

13        33.    Beginning in or around July 2016, Dalius, Evans, and Saivian claimed

14   that Saivian also obtained revenue to fund the cashback payments from merchants

15   who purchased a membership in a separate Saivian program, the Merchant

16   Advertising Platform ("MAP").

17        34.    Under this MAP Program, merchants who made a $125 membership

18   payment every 28 days were listed on the Saivian website and mobile app and

19   could offer the 20% cashback to certain Saivian Cashback Members for purchases

20   at the merchant's business.  Merchants participating in the MAP Program ("MAP

21   Members") did not have access to the POS receipt data collected by Saivian, and

22   had no ability to target their advertising based on the POS receipt data that Saivian

23   claimed to be marketing.

24        35.    Dalius, Evans, and Saivian's claims about the sources of its revenue

25   were false and misleading.  Saivian never generated any revenue from the sale of

26   POS receipt data to marketing partners (or advertising partners).  Saivian did not

27

28

1   have these partners, nor the means to convert the POS receipts submitted by its

2   Cashback Members from their raw form into marketable data.

3         36.    Dalius, Evans, and Saivian's claims concerning the MAP Program

4   funding the Cashback Program were also false.  That program, which was launched

5   more than eight months after the Cashback Membership, was never close to

6   generating sufficient revenues to fund cashback payments.  Saivian earned less than

7   a hundred thousand dollars through the sale of MAP Memberships.

8         37.    In order to limit the amount of cash paid to Cashback Members,

9   Saivian encouraged Cashback Members to redeem their compensation from the

10   scheme in the form of Saivian "passes."  A "pass" was an electronic code that could

11   be entered on the Saivian website to activate or renew a Membership.  Cashback

12   Members who received these "passes" could use them to renew their own

13   Memberships or sell them to a prospective Saivian investor for cash.

14         38.    Saivian instituted arbitrary policies to make it more advantageous for

15   Cashback Members to redeem their rewards in passes as opposed to cash.  For

16   example, Saivian would require a Cashback Member to wait 30 days between cash

17   redemption requests, but not require similar wait times before honoring requests for

18   pass redemptions.  This was done to lull the investors into continuing their

19   investments with Saivian.

20         39.    Beyond encouragement, Saivian Cashback Members were required to

21   redeem their compensation in the form of passes for significant periods of time

22   during the course of the scheme because Saivian purportedly lacked the ability to

23   distribute payments to its Members.  Explaining this requirement, Evans told a

24   Cashback Member, for example, on May 10, 2017, that "Cash back in the form of

25   passes is the only way International markets have been receiving them for over a

26   year now."  During these significant periods of time, the only means for a Cashback

27

28

Member to obtain the compensation promised by the Membership was to recruit other participants into the program by selling them the passes.

**B.    Saivian's Affiliate Program was a Pyramid Scheme**

40.    Dalius, Evans, and Saivian claimed to mirror the activity of legitimate multi-level marketing ("MLM") companies, implying that Saivian was focused on the sale of products (in this case, Cashback Memberships) to non-Affiliates. However, much of its promotional content was devoted to inspiring its Cashback Members to become Affiliates and build their careers by selling Saivian memberships to others.  Defendants promised Affiliates that once they qualified for commission income by personally recruiting three Members (Cashback or MAP), they would receive a daily residual income stream based on their membership sales—both directly and indirectly through their "downline" recruits.

41.    The promised residual income to Affiliates ranged from $5 per day for recruiting and maintaining three active, paying Members up to $3,000 per day (or $1,095,000 annually) for recruiting 8,000 active Members.

42.    As long as three Members remained active, the Affiliate was entitled to $5 per day or $1,825 annually.  Because this Affiliate compensation exceeded the $125 Cashback Membership fee due every 28 days, Saivian advertised this level of the Affiliate Program as "bring 3 and it's better than FREE!" and encouraged Cashback Members to recruit at least three new Members as soon as possible. Beyond this level, the Affiliate Program ranks generally progressed based on the number of active Members "below" the Affiliate in his/her "downline."

43.    The amount of an Affiliate's residual income was not connected in any way to whether his or her downstream members submitted POS receipts to Saivian.

44.    Dalius, Evans, and Saivian represented the Affiliate program to be a life changing entrepreneurial opportunity and a way to achieve significant income

in a short period of time.  They repeatedly touted that selling Memberships to others required little effort on the part of the Affiliates.

45.     For example:

(a)     Saivian advertised that an Affiliate could generate a substantial profit through recruiting teams of Affiliates and "Earn More Money with Less People."  Saivian promised its Affiliates that "You can generate a SIX-FIGURE INCOME with a [sic] few as 750 Team Memberships that you can generate from just two sales teams using our FLEX-BUILD SYSTEM."

(b)     At a Saivian International Conference in March 2017, Evans and Dalius jointly claimed that more than twenty Affiliates were at that time making more than a million dollars a year.

(c)     In a video posted to Saivian's Facebook group page on May 12, 2017, Dalius made multiple claims to the effect that the Affiliate program had "created nearly 60 millionaires . . . in the last 18 months."

46.     These and other such statements were false, or at the very least, materially misleading.  In fact, no Affiliate generated more than $100,000 in commission income paid by Saivian in cash during the entirety of the scheme.

47.     Most of Saivian's communications with its Members—through live events, conference calls, and videos posted on the YouTube and various social media sites-were exhortations to sell Saivian Memberships, employing generic motivational content about building one's own business and acquiring great wealth.

48.     As the program was initially designed and implemented, Affiliates were required to maintain an active Cashback Membership in order to remain eligible to receive payments for recruiting Affiliates to Saivian.  Thus, Affiliates were required to pay the Cashback Membership fee of $125 every 28 days in exchange for the right to sell Saivian's Cashback and MAP Membership products.

- 15 -

49.     On or about February 13, 2017, Saivian announced a change to its signup process that allowed individuals to sign-up to participate as Affiliates in the program without purchasing a Cashback Membership ("Affiliate Only"). Nonetheless, individuals who registered for the Saivian opportunity as Affiliate Only were still required to pay a fee of $130 for the right to sell the Saivian Cashback Membership product.

50.     Saivian Affiliates were also required to redeem their compensation in the form of passes for significant periods of time during the course of the scheme because Saivian purportedly lacked the ability to distribute commission payments to them in cash.  For example, Saivian paid no recruiting commissions in cash between the date that the "Affiliate Only" signup option was announced, February 13, 2017, and April 27, 2017 – and even then, the commission cash payout option was limited to high ranking Affiliates who were permitted to apply for a Saivian branded debit card.  Thus, Affiliates were required to use the compensation owed to them by Saivian to purchase additional product (in the form of Saivian's Cashback Memberships) that had to be resold to new investors.

51.     Saivian also sponsored numerous "Promotions" for its Affiliates that augmented the promised benefits of the compensation plan and placed a premium on recruiting large teams.  For example, from May 12-31, 2017, Saivian ran its "Million Member Promotion" which offered its certain high ranking Affiliates a share of a bonus pool when any Affiliate in their sales team downline "ranked up" to a new level on the Affiliate compensation chart based on their own recruiting efforts and those of their downline recruits.  As Dalius explained in a May 12, 2017 video posted to the Saivian Facebook group announcing the program:

> When you have a Founder go ahead in your line of sponsorship -- now listen to me carefully – whether you personally sponsored them or not -- okay now – now the bonuses got real big, okay?  It's not just based on your personally sponsored, but it's their sponsor and their sponsor and their sponsor and there are no levels. It's to infinity.  And very exciting, very powerful. So now

listen.  When a Founder go ahead and happens you're going to receive a $10.00 bonus, okay?  When a VIP occurs, you're going to receive a $30.00 bonus and when you have an Elite it's a $60.00 bonus, okay?  Folks, if you're a One Star and you have a Founder in your group in your line of sponsorship, you deserve a $10.00 bonus.  And when that Founder becomes a VIP you earn another 30.  And when they become an Elite, you earn another 60.  That's a total of how much? $100.00.

52.     Dalius promised that the bonus potential increased exponentially as an Affiliate reached the highest levels of the compensation plan:

You see as a Five Star you have to have a team of what, 750, right?  As a Presidential Ambassador . . . you had a team of 1,000 and so what that represents is what we call the 10x power.  You see as a Presidential -- an Ambassador you've got up to ten times more affiliates underneath you that are achieving Founder, VIPs and Elites.  That means you have ten times or up to ten times of earning potential, the earning opportunity during this promotional period. So you want to get an ambassador sooner versus later, absolutely.

53.     Cashback Members' investments were pooled together by Dalius and Saivian to make Affiliate and Affiliate bonus compensation payments (as well as cashback payments).  Affiliates' expectation of profit, therefore, was dependent on Saivian being a profitable endeavor.  As a result, the Affiliate payment portion of Saivian was an "investment contract" under the federal securities laws.

54.     Any prospective Saivian investor would have wanted to know that the Saivian business model was a Ponzi and/or pyramid scheme.

55.     Any prospective Saivian investor would have wanted to know that the Saivian business model was unsustainable and could never deliver on the income claims that Dalius and other promoters promised for the vast majority of participants.

**II.     Dalius, Evans, PRE, Saivian LLC and Saivian International Made Materially False Representations in Furtherance of the Illegal Saivian Scheme**

56.     Dalius, Evans, PRE, Saivian LLC and Saivian International repeatedly and falsely represented that Saivian generated the revenue for cashback

- 17 -

payments from the sale of Cashback Members' POS receipts to marketing partners (and advertising partners), or monetized the POS receipt data to sell targeted advertising. Dalius, Evans, PRE, Saivian LLC and Saivian International claimed this was the same way that Facebook and Google leverage the consumer preference data of their users to sell targeted advertising on their websites. Dalius, Evans, PRE, Saivian LLC and Saivian International also repeatedly and falsely represented that the revenue for cashback payments came from the MAP Program. Typical examples of the Defendants' repeated and false representations now follow.

### A. Dalius, Evans, PRE, Saivian LLC and Saivian International Misrepresented That Cash Back Payments Were Funded by the Sale of POS Receipts or Data to Third Parties

57. In an October 26, 2015 conference call announcing the pre-launch of Saivian, Dalius told the participants:

> All this registration and recording process allows the company to collect the data for the marketing partners. . . . [B]ased on the data of the purchasing pattern, the marketing partners can make a decision in regards to what level of advertising they're going to purchase with the company. . . . [T]he goal of the advertising revenue is to help subsidize the cashback model to our members. Folks, this concept of generating revenue through the advertising based on their members' interests, well guess what, that's similar to a billion dollar brand that we all know called Facebook. . . . .They're collecting all of the data from all of the members' interests, all of the things that we like, and they sell it to their advertisers and make billions of dollars a year. And so instead of just keeping it all for themselves, here comes along this company taking that revolutionary concept and now sharing it with the masses.

58. On a January 22, 2016 recorded phone call with a prospective investor, Dalius said:

> Here is what Saivian does: they make that data available to the marketing partners, okay? And their marketing partners then can spend money on advertising. But here's the deal – instead of the corporation, Saivian, keeping all of the money like Facebook does . . . they take that money and funnel it back in form of 20% cashback shopping to their members.

- 18 -

59.     On the same January 22, 2016 conference, Dalius also represented:

> If you understand what I just shared with you about Facebook -- which they already do -- then you are going to understand exactly how Saivian makes their money in a big way. . . Here is what we do: with Saivian, instead of collecting 'likes' and 'interests' what are we doing?  We are collecting what they call 'POS' point of sale data from our members, right?  Cause our members are entering in where they are shopping, how much they are spending, and how often they are going, okay?  And so they're getting all of this information -- and, now point of sale data is about 10 to 100 times more valuable than likes and interests.  And everyone agrees with that.  Makes sense, right?

60.     Beginning at least as early as February 3, 2016, Saivian's website (www.saivian.net), in content drafted by Dalius, publicly proclaimed:

> The math is simple, keeping your Retail Shopping Membership active is almost like DOUBLING your money in value every year; by easily continuing to do something you always have and will continue to do in the future.  The registration and recording process allows us to collect the data necessary for our marketing partners.  Then, based on the data of the purchasing patterns, the marketing partners can make a determined decision regarding what monetary level, medium, and location of advertising to purchase.  The goal of the advertising revenue is to help subsidize the cash back model to our active members.  Generating revenue through advertising based on their members' interests is similar to how billion dollar brands like Facebook and Twitter work.

61.     On an August 28, 2016 video posted to the official Saivian YouTube page, a top Saivian Affiliate answered a question about how Saivian was able to pay Cashback benefits by stating:

> We're selling these receipts okay?  We have marketing partners that are buying the receipt information because they want to know [about real consumer behavior].  We've got to know what people are actually buying so we can market the right things to them, okay?  That's the second way, each of these receipts is being bought at a fixed price. . . . The residual income—all that stuff—is being paid by advertising dollars and not from the $125 that is coming in.  That's what you need to explain to people, and if you do that they are going to see that this is not a pyramid scheme.

62.     On a December 28, 2016 Saivian webinar posted to the official Saivian YouTube page, in response to a question about "the advertisers that are buying our receipts" Evans stated:

> We have three vendors right now.  I'm not going to release their names, because they're mine. They are – they're my personal contacts, as well as, you know, EJ, his personal contacts. We've got big connections with these data buying collecting companies.

63.     On a February 27, 2017 video posted to the official Saivian YouTube page, Evans stated: "Marketing partners give Saivian the money, we are the ones giving you cashback."

64.     On a June 21, 2017 video posted to Saivian's Facebook membership group featuring Evans and a top Saivian Affiliate, in response to a hypothetical concern that "it seems too good to be true on the fact that I can pay $125 and get back $240 a month," the Affiliate stated:

> [I]t's simple.  We sell that information to big marketing companies, so they're willing to do that for the information that we're giving.  That's why they can give us that cash back and that's it.  Don't go into, well, there's a business opportunity tied to it and this works like this and you could make commissions.  That's not the question they're asking. They're asking you how we can afford to give them that $250 back.

65.     Contrary to these claims, neither Dalius nor Saivian generated any revenue from the sale of POS receipts.  In fact, Saivian never had any marketing partners (or advertising partners) and never made any serious efforts to sell or otherwise monetize the data in its Cashback Members' POS receipts.

**B.      Dalius, Evans, PRE, Saivian LLC and Saivian International Misrepresented That the Cashback Payments Were Funded by the MAP Program**

66.     In April 2016, prior to the launch of the MAP Program, Dalius responded indirectly (through Saivian's then-Marking Director) to a Cashback Member's question about the source of revenue to pay cashback payments by

falsely stating "[i]t's all about third party advertising which is being officially rolled out through the MAP program."

67.     Subsequently, during a December 28, 2016 Saivian webinar posted to the official Saivian YouTube page, Evans misrepresented that MAP Memberships—which he claimed numbered 400 worldwide at the time—were fully funding cashback payments.

68.     In reality, Saivian had sold very few MAP Memberships to retailers. Saivian was only able to pay earlier investors their investment returns with funds that Saivian obtained from later investors.

### C.     The Misrepresentations Regarding the Source of Revenue to Satisfy Saivian's Cashback Obligations Were Material

69.     The truth regarding Saivian's revenue source to fund its cashback payments was material information to potential investors.  Any prospective Saivian investor would have wanted to know that the promised cashback payments were almost entirely funded by Cashback Membership investments and not connected in any way to the sale of POS receipts, data, or targeted advertising.

70.     Dalius, Evans, PRE, Saivian LLC and Saivian International knew, or were reckless in not knowing, that the statements were false and misleading when they were made.

### D.     Dalius, PRE, Saivian LLC and Saivian International Initially Concealed Dalius's Role in Saivian and Dalius, PRE, Saivian LLC and Saivian International Omitted to Disclose His Criminal Conviction After Dalius's Role Was Revealed

71.     Dalius was indicted in the Eastern District of Pennsylvania in January 2000 on mail fraud, wire fraud, and conspiracy charges in regards to a long distance phone card scam. *United States v. Dalius*, 2:00-cr-00026-FVA-1 (E.D. Pa).

72.     The indictment alleged that Dalius and a co-defendant owned and promoted a corporation, Telecom Solutions, Inc. ("Telecom Solutions"), which

marketed long distance debt calling cards and "One Plus" long distance service for individual telephone lines through the use of a multi-level marketing scheme.  As alleged in the indictment, debit calling cards are prepaid to the long distance company which supplies the calling cards.  Credit calling cards are periodically billed after the calls are made.

73.    Both Dalius and his co-defendant began to market the debit cards and accept money from customers before they contracted with any long distance carrier to supply the debit calling cards.

74.    The Indictment alleged that throughout the course of the conspiracy, Dalius and his co-defendant diverted hundreds of thousands of dollars in company dollars to personal use.

75.    On January 18, 2001, Dalius pled guilty to conspiracy to commit mail and wire fraud.  He was sentenced to 12 months and 2 days imprisonment, 3 years of supervised release and restitution.  *United States v. Dalius*, 2:00-cr-00026-FVA-1 (E.D. Pa) at Dkt. #17.

76.    For the first year of Saivian's existence, the full scale of Dalius's involvement in the enterprise was not disclosed to investors.  At Dalius's instruction, Saivian identified a person with no actual authority over its operations or finances, as Saivian's President.  This figurehead President had no involvement in the management of the scheme and participated principally by (1) allowing himself to be identified on Saivian's website as the "President" and (2) reading scripts that Dalius drafted for him on investor conference calls and at live events.  Meanwhile, Dalius, the true mastermind of the scheme, was identified by Saivian (to the extent he was mentioned at all on marketing conference calls or videos) as the "lead consultant."

77.    When Dalius finally announced himself as the "new" Saivian President in October 2016, no mention was made of his role in creating and administering the

scheme since its inception, nor was his past federal conviction in connection with a prior fraudulent scheme disclosed.  Instead, Saivian introduced Dalius as if he were a new addition to the management team, and promoted Dalius' background, skills and prior success.  His biography posted to the Saivian website stated that:

> Eric is a marketing professional with a Bachelor's Degree in marketing from Penn State University.  He has helped companies generate over $150 Million since 1990 in his career.  With a background in real estate investing and sales, he has directed those skills to primarily focus on providing consulting in the MLM or Network Mark[et]ing [sic] profession.  He is now the President of the fastest growing network market company in the world, Saiv[i]an [sic] International!

78.     Even after Dalius was introduced as President, and throughout the remainder of the scheme, Defendants never disclosed that he was a convicted felon, or that he created and exercised total control over the scheme from its inception.

79.     The truth about Dalius's prior criminal conviction and the extent of his control over the Saivian enterprise was material information to Saivian investors.

**III.     Dalius Repeatedly Refused to Answer Questions About the Illegal Scheme in His Investigative Testimony, Refused to Produce Subpoenaed Documents and Tried to Block Others from Doing So**

80.     In investigative testimony before the SEC, Dalius refused to answer any substantive questions about the Saivian scheme on the grounds that his answers may incriminate him.  Significantly, Dalius refused to answer whether he had spoken to witnesses that testified before the SEC in its Saivian investigation and refused to answer whether he had destroyed any documents that the SEC subpoenaed from him.

81.     Dalius refused to produce records subpoenaed from him and Saivian LLC that reflect the magnitude of his fraud, particularly documents related to Defendants' sales to persons outside of the United States, and documents related to

Dalius's receipt and disposition of digital assets (primarily Bitcoin) through which he received a significant portion of Members' investments.

82.    Dalius also fought to block the SEC's access to highly relevant records, including records that reflect the nature of the illegal scheme and his role in it.  For example, he attempted to pressure a third-party vendor who maintained the database of the scheme's transactions from producing the database to the SEC. Ultimately, the effort to prevent the vendor from producing the database failed.

**IV.    The Cashback Membership and Affiliate Program Constituted the Unregistered Sale of Securities**

83.    Savian's Cashback Membership and Affiliate program are securities under federal law.

84.    At the time of their sales to the investing public, Saivian had not registered either the Cashback Membership or Affiliate program with the Commission.

85.    No exemption to registration applied to the sale of either type security.

**V.    Dalius Has Dissipated And Is Continuing To Dissipate Millions Of Dollars Of Investors' Funds**

86.    Between October 26, 2015 and September 1, 2017, Dalius and the Corporate Defendants collected millions of dollars from Saivian investors in the United States and abroad.

87.    Throughout the course of the Saivian scheme, and in the ensuing months since its closure, Dalius comingled all of the funds obtained in the course of the Saivian scheme — irrespective of corporate entity and country of origin — with each other, and with his own personal funds.

88.    Dalius used most of the Saivian victims' money to fund a lavish and luxurious lifestyle for himself and his family.  Dalius used approximately 75% of the $10.7 million in revenue deposited in Saivian's domestic bank accounts for his own benefit, including transferring approximately $4.2

million to his personal bank accounts, using approximately $2.4 million to pay off credit card bills, and using approximately $1.27 million to pay other assorted personal expenses.

89.     In addition to the approximately $10.7 million less refunds deposited directly into bank accounts by investors, Dalius converted enough Bitcoin received from investors to realize more than $164 million, most of which went to his personal benefit.

90.     For example, Dalius converted over $36 million of Bitcoin that he collected from the Saivian scheme to purchase properties in California, New York, and Florida.  These purchases included a $16.5 million mansion in Miami Beach, and a $10.3 million townhouse on the Upper East Side of Manhattan.

91.     Dalius also converted $39.5 million of Bitcoin that he collected from the Saivian scheme and transferred it to brokerage trading accounts he controlled to fund stock purchases.

92.     And Dalius converted millions of dollars of Bitcoin that he collected from the Saivian scheme to fund private jet travel, luxury vacations, sporting and entertainment event tickets, and the purchase of an exotic automobile.  Examples of these purchases included a new Lamborghini for almost half a million dollars, and more than $181,000 for a five night vacation to the Bahamas to celebrate his daughter's 21st birthday—including premium hotel accommodations (2 and 3 bedroom penthouse suites), poolside cabanas, and charter jet transportation for seven passengers from Los Angeles.

**VI.     Dalius Purchased Real Property Titled In The Names Of Relief Defendants With Misappropriated Investor Funds**

93.     On or around January 13, 2017, Dalius purchased real property located at 1400 21st Street Manhattan Beach, California titled in the name of

Relief Defendant MB Homes LLC for $3,225,000.  Dalius consummated this purchase with Saivian investment funds received from Saivian investors in the form of Bitcoin.  MB Homes LLC did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

94.    On or around July 31, 2017, Dalius purchased real property located at 1300 Highland Avenue, Unit 111, 112, 211 and 212, Manhattan Beach, California titled in the names of Relief Defendants 1300 Highland Unit 111 LLC, 1300 Highland Unit 112 LLC, 1300 Highland Unit 211 LLC, and 1300 Highland Unit 212 LLC, respectively, for $2,325,000.  Dalius consummated this purchase with Saivian investment funds received from Saivian investors in the form of Bitcoin.  1300 Highland Unit 111 LLC, 1300 Highland Unit 112 LLC, 1300 Highland Unit 211 LLC, and 1300 Highland Unit 212 LLC did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

95.    On or around October 9, 2017, Dalius purchased real property located at 147 East 63rd Street, New York, New York titled in the name of Relief Defendant NYC Homes LLC for $10,300,000.  Dalius consummated this purchase with Saivian investment funds received from Saivian investors in the form of Bitcoin.  NYC Homes LLC did not exchange anything of equivalent value for the funds it received from the Saivian scheme.

**FIRST CAUSE OF ACTION**
**EMPLOYED A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD**
**Violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]**
**(ALL DEFENDANTS)**

96.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95, above.

97.    Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means

1  or instruments of transportation or communication in interstate commerce or
2  by use of the mails, with scienter, employed devices, schemes, or artifices to
3  defraud.

4      98.   By reason of the foregoing, Defendants, directly or indirectly
5  violated, and unless enjoined will continue to violate, Sections 17(a)(1) of the
6  Securities Act [15 U.S.C. § 77q(a)(1)].

7  **SECOND CAUSE OF ACTION**
8  **OBTAINED MONEY OR PROPERTY BY MEANS OF UNTRUE
STATEMENTS**
9  **Violation of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(1)]**
10 **(DEFENDANTS DALIUS, EVANS, PRE, SAIVIAN LLC AND SAIVIAN
INTERNATIONAL)**

11
12     99.   The Commission realleges and incorporates by reference the
13 allegations contained in Paragraphs 1 through 95, above.

14     100.   Defendants Dalius, Evans, PRE, Saivian LLC and Saivian
15 International, by engaging in the conduct described above, directly or
16 indirectly, in the offer or sale of securities, by the use of the means or
   instruments of transportation or communication in interstate commerce or by
17 use of the mails, with scienter, obtained money or property by means of
18 untrue statements of material facts and omissions of material facts necessary
19 to make the statement made not misleading.
20
21     101.   By reason of the foregoing, Defendants Dalius, Evans, PRE,
22 Saivian LLC and Saivian International, directly or indirectly violated, and
23 unless enjoined will continue to violate, Sections 17(a)(2) of the Securities
24 Act [15 U.S.C. § 77q(a)(2)].
25
26
27
28

**THIRD CAUSE OF ACTION**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**Violation of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)]**
**(ALL DEFENDANTS)**

102.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95, above.

103.   Defendants, by engaging in the conduct described above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

104.   By reason of the foregoing, Defendants, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate, Section 17(a) (3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**FOURTH CAUSE OF ACTION**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violation of Section 10(b) of the Securities Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]**
**(ALL DEFENDANTS)**

105.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95, above.

106.   Defendants, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the mails, in connection with the purchase or sale of securities, with scienter, employed devices, schemes, or artifices to defraud, or engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

107.   By reason of the foregoing, Defendants, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

**FIFTH CAUSE OF ACTION**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violation of Section 10(b) of the Securities Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]**
**(DEFENDANTS DALIUS, EVANS, PRE, SAVIAN LLC AND SAVIAN INTERNATIONAL)**

108.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95, above.

109.   Defendants Dalius, Evans, PRE, Saivian LLC and Saivian International, directly or indirectly, in connection with the sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order the make the statements made, in the light of the circumstances under which they were made, not misleading.

110.   Defendants Dalius, Evans, PRE, Saivian LLC and Saivian International, acted knowingly or recklessly in the above described false and misleading statements and omissions.

111.   By reason of the foregoing, Defendants Dalius, Evans, PRE, Saivian LLC and Saivian International, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**SIXTH CAUSE OF ACTION**
**CONTROL PERSON LIABILITY**
**Violation of Sections 20(a) of Securities Exchange Act [15 U.S.C. §78t(a)]**
**(DALIUS)**

112.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95, above.

113.   Dalius, by engaging in the conduct described above, directly or indirectly controlled the Saivian entities liable under any provision of the Securities Exchange Act or regulation thereunder for the acts of their officers and employees who engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

114.   By reason of the foregoing, Dalius, violated, and unless restrained and enjoined will continue to violate, Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)].

**SEVENTH CAUSE OF ACTION**
**OFFER AND SALE OF UNREGISTERED SECURITIES**
**Violation of Sections 5(a) and (c) of the Securities Act**
**[15 U.S.C. § 77e(a) and (c)]**
**(ALL DEFENDANTS)**

115.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95, above.

116.   Defendants, by engaging in the conduct described above, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or the mails, offered to sell or sold securities or, directly or indirectly, carried such securities through the mails or in interstate commerce, for the purpose of sale or delivery after sale.

117.   No registration statement has been filed with the Commission or has been in effect with respect to these securities.

118.   By reason of the foregoing, Defendants, directly or indirectly violated, and unless enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

### EIGHTH CAUSE OF ACTION
### DISGORGEMENT BY THE RELIEF DEFENDANTS
### (ALL RELIEF DEFENDANTS)

119.   The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95, above.

120.   The Commission does not allege that the Relief Defendants violated the federal securities laws.  The Relief Defendants however received, directly or indirectly, funds or other property from one or more of the Defendants or from Saivian investors, which are either the proceeds of, or are traceable to the proceeds of, unlawful activities alleged in this Complaint to which the Relief Defendants have no legitimate claim.

121.   By reason of the foregoing, it would be inequitable for the Relief Defendants to retain the proceeds from Defendants' violations of the federal securities laws and such proceeds should be disgorged.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged herein.

### II.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that temporarily, preliminarily and permanently enjoin Defendants and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive

actual notice of the order by personal service or otherwise, and each of them,

(1) from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Sections 17(a) and Sections 5(a) and (c) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder; and

(2) from offering, operating, or participating in any marketing or sales program in which a participant is compensated or promised compensation solely or primarily (a) for inducing another person to become a participant in the program, or (b) if such induced person induces another to become a participant in the program.

## III.

Enter an order directing Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains and directing Relief Defendants to disgorge all ill-gotten gains transferred to them without compensation.

## IV.

Enter an order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

//
//
//
//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.

Grant such further relief as this Court deems just, appropriate, and necessary.

DATED October 3, 2019

Respectfully submitted,

/s/ Kenneth W. Donnelly

KENNETH W. DONNELLY
donnellyk@sec.gov
DEREK S. BENTSEN Cal. Bar No. 232550
bentsend@sec.gov
GEOFFREY GETTINGER
gettingerg@sec.gov
MICHAEL FLANAGAN
flanaganm@sec.gov
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-4946 (Donnelly)
Facsimile: (202) 772-9282 (Donnelly)

Attorneys for the Plaintiff
Securities and Exchange Commission

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
100 F St., NE, Washington, DC 20549
Telephone No.  (202) 551-6426; Facsimile No.  (202) 772-9245.

On October 3, 2019, I caused to be served the documents entitled **STIPULATION RE: SCHEDULE FOR AMENDMENT OF COMPLAINT** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Washington, DC, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Washington, DC with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☒ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Washington, DC.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  October 3, 2019

*/s/ Kenneth W. Donnelly*
Kenneth W. Donnelly

*SEC v. Eric J. "E.J." Dalius, et al.*
**United States District Court—Central District of California**
**Case No. 2:18-cv-8497-CJC-E**

## SERVICE LIST

Howard Schiffman
Schulte Roth & Zabel
919 Third Avenue
New York, New York 10022
*Counsel for Eric Dalius, Professional Realty Enterprises, Inc., MB Homes LLC, NYC Homes LLC, 1300 Highland Unit 111 LLC, 1300 Highland Unit 112 LLC, 1300 Highland Unit 211 LLC, 1300 Highland Unit 212 LLC.*

Edward Gartenberg
Gartenberg Gelfand Hayton LLP
15260 Ventura Boulevard, Suite 1920
Sherman Oaks, California 91403
*Counsel for Saivain LLC, Eric Dalius, Professional Realty Enterprises, Inc., MB Homes LLC, NYC Homes LLC, 1300 Highland Unit 111 LLC, 1300 Highland Unit 112 LLC, 1300 Highland Unit 211 LLC, 1300 Highland Unit 212 LLC.*

Saivian Int Ltd
c/o Eric Dalius, Director
3rd Floor, 120 Baker Street,
London, England W1U 6TU

Saving Network App Limited
c/o Eric Dalius, Director
Room 1217, 12/F, International Commerce Center, 1 Austin Road West, Kowloon, Hong Kong

Saivian International Limited
c/o Eric Dalius, Director
Room 1505, 15/F., Yu Sung Boon Building
107-111 Des Voeux Road Central
Hong Kong